*Chapline vs. Moore &c.*
*M'Afee and ux. vs. Moore &c.*
*Chapline and ux. vs. Moore &c.*

AND

*Moore vs. Chapline &c.*

Case 25.

Cross appeals from the Mercer Circuit; W. L. KELLY, Judge.

*Infants. Executors. Guardians. Fees of counsel. Distribution. Husband and wife. Commission. Interest. Accounts. Parties. Practice.*

April 19.

Chief Justice BIBB delivered the Opinion of the Court.

Parties.

LAWSON MOORE, George Moore and William Moore were brothers. George died in 1810, in the county of Westmoreland, in the State of Virginia, leaving his widow, Hannah, and four infant children, Elizabeth, (now wife of Jacob Chapline,) Judith Ellen Moore, (now wife of Robert M'Afee,) William B. Moore, and Allen Lawson Moore.

Will. Moore dies and

In 1812, one other of the brothers, William Moore died, in the State of Pennsylvania, and town of Carlisle, unmarried and intestate, leaving a considerable estate, real and personal.

Irvine and Given appointed his administrators.

In July 1812, administration of the goods and chattels, rights and credits of said deceased, William Moore, was committed, by the orphan's court of the county of Cumberland, and State of Pennsylvania, held in the town of Carlisle, to William Irvine and James Given, who entered into bond, in a penalty of sixty thousand dollars, with approved sureties, for the due administration and account of the personal estate.

Appraisement.

The administrators, on the 23rd of September, 1813, returned an inventory and appraisement of the personal estate, to the amount of $42,059 13, an account of effects administered to the amount of $24,578 24, shewing a balance unadministered, of seventeen thousand four hundred and eighty dollars eighty-nine cents.

Settlement of

In this account of credits claimed by the administrators, of $24,578 24, is included a claim of $1426

50, for their services, founded on an agreement of Lawson Moore with them, for their resignation, to allow five per cent on the monies theretofore paid, as well as upon those paid over to the administrator, *de bonis non*, to be appointed, and two and an half per cent upon all paper securities delivered over to their successor, when, and as the judgments, notes and book accounts should be collected. The credit of $1426 50, thus claimed, was passed, *de bene esse*, by virtue of that agreement, by the orphan's court, subject to any equity, which may, or can arise, when the minors arrive at age, if it is then thought proper to dispute the same. And upon the said settlement, the court entered of record, that it appeared to the court there were ample assets to discharge all debts.

Upon this settlement the administrators resigned, and the court appointed Christian Leonard, administrator *de bonis non*, who gave bond and security accordingly. His account was settled and approved by the court, on the 12th December, 1822, shewing a balance in his hands of $1434 24, for distribution.

On the petition of Lawson Moore to the orphan's court, on the 15th September, 1812, stating that one half of the real estate belonged to himself as one of the heirs, and the other moiety to the four infants, under fourteen years, children of George Moore, deceased, the other heirs of William Moore, deceased, and praying partition of three several tracts of land, appropriate writs of inquisition, *de partitione inquirendo*, as known to the laws of Pennsysvania, were issued. Upon these inquests the number of acres of each tract, and values per acre, were returned, with a report, that a partition of the several tracts could not be made by division of the lands, without spoiling the tracts. At the September court, 1813, Lawson offered sureties to be bound with him for payment to the other heirs, their respective shares of the said valuation, and to take the whole of the lands, which being approved, eight several recognizances were acknowledged in court by Lawson Moore, and his sureties, to the guardians

CHAPLINE AND MOORE, &c.

Irvine and Given's administration account.

Irvine and Given's resignation and Leonard appointed administrator *de bonis non*.

Real estate of the deceased in Pennsylvania purchased by Lawson Moore under proceedings had in Orphans court.

CHAPLINE
AND
MOORE, &c.

of the infants, conditioned for the payment of the sums due to the other heirs respectively. The court had theretofore appointed Thomas Urie and John Helpelstein, guardians for the infant heirs, and they had executed bonds with security for the faithful performance of their duties. The aggregate valuation of the three tracts, after deducting the costs of the inquisitions, amount to $19,052 52 cents, the half of which was $9526 26 cents, which gave to each of the infants the sum of $2381 56 1-2 cents, and so the recognizances require that sum to be paid to the use of each, on or before the 25th of September, 1814, with interest from the 25th March, 1814.

Widow and children of Geo. Moore come to Kentucky, and she marries A. Chapline.

In the latter part of the year 1813, Lawson Moore brought the widow and children of his brother George Moore, from Westmoreland county, Virginia, to the county of Mercer, Kentucky, settled Mrs. Moore with her children, on a small tenement, on a tract of land belonging to him, where she and the survivors respectively continued to reside, until the marriage of Mrs. Moore with Abraham Chapline. Allen Lawson Moore died in Mercer unmarried, intestate, an infant of tender years, in 1814.

Moore's settlement with his brother's widow, shortly before her and Chapline's marriage.

On the 25th March, 1819, very shortly before Mrs. Moore's marriage with Abraham Chapline, Lawson Moore stated an account against her for house rent, articles of provision, &c. &c. with credits also made out by him for boarding and clothing her children, making a debit against her of $1920, the credits amounting to $1351, leaving a balance of $574, for which he took her note, and also her receipt for $1139 to himself as guardian of the children; this sum he charges against the children.

Moore's accounts, as guardian of his brothers children.

After the intermarriage of Jacob Chapline and Elizabeth, at their instance, Lawson Moore was summoned by the county court, to make his account as guardian, never having rendered any. He exhibited his accounts to the commissioners of the county court, on the 30th September, 1820, which, when reported, the county court refused to approve.

Abraham Chapline and wife, Hannah, had, in September, 1819, exhibited their bill, to set aside the note obtained from her by Lawson Moore; in October, 1820, Lawson answered. Upon the coming in of this answer, Abraham Chapline and wife amended their bill, called for an account of the estate of William Moore, received by said Lawson, claiming the share to which the mother was entitled by the death of her son Allen Lawson Moore, making the other children parties.

The defendants, Jacob Chapline and wife, Elizabeth, and Robert M'Afee, and Ellen his wife answered, and made cross bill against Lawson Moore, Abraham Chapline and wife, and William B. Moore, charging Lawson with the recognizances given by him for the real estate, and charged him as having received considerable sums of the personal estate, and prayed for an account and settlement, and a decree for the balance due from him as guardian.

To this amended bill, and to this cross bill, Lawson Moore for himself, and as guardian to William B. Moore answered, and exhibited the account which had been rejected by the county court. He charges himself with the real estate only, from which he deducts a large sum for his salary, expenses of himself and horse in going to Pennsylvania, and to Westmoreland in Virginia, attornies' fees, copies &c. amounting to four thousand nine hundred and seventy dollars twenty eight cents, reducing the assessments of the real estate for which he holds himself accountable to $15,074 24, one half of which he passes to the credit of the heirs of Geo. Moore generally. Against that moiety, he exhibits an account against the children generally, for charges and expenses, in removing them and their mother to Kentucky, amounting to the sum of nine hundred ninety-six dollars eighty-nine cents, leaving a balance of seven thousand five hundred thirty-seven dollars, twelve cents, as due on the 25th March, 1814; against this he exhibits his accounts for support and education, and articles furnished the children individually, including the receipt obtained from the mother by said Lawson, for her account

CHAPLINE
AND
MOORE, &c.

Bill of Chapline, and wife for surrender of her note to Moore, and amended bill for an account of Wm Moore's estate.

Answer and cross bill of the other distributees against Moore, for account.

Lawson Moore's answer, and his account.

CHAPLINE AND MOORE, &c.

against the children. The account against his ward, Elizabeth, wife of Jacob Chapline, amounts to $863 56; against his ward, Judith Ellen, wife of M'Afee, to $762 52; against the deceased child, Allen Lawson Moore, including the funeral charges, to $64 42.

Moore's cross bill against Chapline and wife.

By a cross bill, the defendant Lawson Moore, prayed a decree over against Jacob Chapline, provided it should be found that the advances in money, and a tract of land conveyed to him, on account of his wife's share, should overgo her proportion. The receipt for this land is of the 24th April, 1821, for $3375, and expresses that Jacob Chapline is to pay the surplus, if any, above his share, to Ellen Moore.

Decree of the circuit court

The circuit court charges Lawson Moore with the sum of $707, as half of the personal estate received by him, which added to the recognizances for the real estate, is made an aggregate of $10,233 26, of real and personal estate for the shares of George Moore's children. Against this aggregate sum, the court allowed, as a credit to the guardian, $1096 35, part of the account (N) (as stated in the commissioners report,) the whole being for $1246 35, and allowed the sum of $1389 72, part of the account (M) as stated in the report, (the whole of this account, amounting to $4935 78.) These allowances, together with $64 42, against Allen, deceased, are set off against the before mentioned aggregate of real and personal estate, so as to reduce the amount to $7682 77. This reduced sum was divided between the surviving children of George Moore, to the exclusion of the mother, and from their respective shares thereof so produced, the accounts of the guardian against the children individually, were deducted. To M'Afee and wife, a balance of $2,046 46, with interest at the rate of six per cent, from the 22d February, 1826, till paid, is decreed. The share of William B. Moore, is left in the hands of the guardian Lawson, until some person is lawfully authorized to demand it from him, subject to his future advances. Against Jacob Chapline and wife, the sum of $1576 49, with inter-

est at six per cent, from 26th of February, 1826, till paid, is decreed in favor of Lawson Moore, as a surplus above the share of Ellen. The bill of Mrs. Hannah Moore, the widow, is dismissed, no part of the estate being allowed her, and the account and settlement complained of on her part, not having been deemed worthy of reform.

The guardian complains of the decree for not allowing the whole of her claims; the heirs complain of the allowances made, and of the short allowance for their share of the personal estate; the widow of George Moore, now the widow of Abraham Chapline, complains of the refusal to allow her a distributive share as one of the heirs of her deceased son, and of the affirmation of the note obtained from her shortly before her marriage.

Objections to the decree by the several parties.

The following charges in the accounts, M and N, referred to in the decree, will exhibit the principal subjects of complaint against the decree, in fixing the sum for which Lawson Moore is accountable, as due on the recognizances.

Lawson Moore's account against his wards, &c

(Ac'T. M.) THE ESTATE OF WM. MOORE, OF CARLISLE, TO LAWSON MOORE, DR.

| | | | |
|---|---|---|---|
| a—1. | 1812. | To my services eight months, attending to the estate in Carlisle, | $333 33 |
| a—2. | | My expenses travelling to and from, and stay there this year, | 350 00 |
| a—3. | | Horse expenses same time, | 150 00 |
| r—4. | | My expenses travelling to Westmoreland county, in Virginia, to get the names, ages, &c. of said children, in order to lay in their claim to the estate of the deceased, William Moore; (commissioners' report states this trip to get affidavits to prove the heirs of the estate,) | 100 00 |
| | | | ———833 33 |
| a—5. | 1813. | To my services 12 months, attending to the estate at Carlisle, | 500 00 |
| a—6. | | My expenses travelling and stay there this year, | 350 00 |
| a—7. | | Horse expenses same time, | 150 00 |
| | | | ———1000 00 |
| r—8. | 1814. | To my services this year, 12 months, | 500 00 |
| r—9. | | Expenses travelling and stay there this year, | 475 00 |
| r—10. | | Horse expenses this year, | 180 00 |
| | | | ———1155 00 |
| r—11. | 1815. | To my services this year, three months, | 125 00 |

| | | | | |
|---|---|---|---|---|
| CHAPLINE AND MOORE, &c. | r—12. | My expenses, travelling and stay &c. | 180 00 | |
| | r—13. | Horse expenses, | 33 00 | |
| | | | | ———338 00 |
| Lawson Moore's account against his wards, &c | r—14. 1816. | To services this year, trip to Carlisle, on same business 3 months, | 125 00 | |
| | r—15. | Expenses, travelling and living there, | 190 00 | |
| | r—16. | Horse expenses same time, | 40 00 | |
| | | | | ———355 00 |
| | r—17. 1820. | To services this year, attending to business of the estate at Carlisle, 2 months, | 83 33 | |
| | r—18. | Expenses going and coming, self and horse, | 126 00 | |
| | | | | ———906 33 |
| | a—19. 1814. | April 30. To cash paid James and Thomas Duncan, as per receipt and contract, | . 915 74 | |
| | a—20. 1812. | To cash paid for county seal, to affidavits and witnesses, | 3 00 | |
| | a—21. 1814. | 29 April, Cash paid Ramsey, clerk orphan's court, per receipt, | 3 20 | |
| | a—22. 1812. | To cash paid Chinn, for copy of inventory, | 11 83 | |
| | a—23. | ——paid William Ramsey, clerk, on copies of confirmation of real estate, | 5 00 | |
| | a—24. | ——Sundry examinations of different offices, | 6 00 | |
| | | | | $4935 78 |

### (Act'. N.) THE HEIRS OF GEO. MOORE, DECEASED, TO LAWSON MOORE,   DR.

| | | | |
|---|---|---|---|
| r—25. 1812. | To expenses travelling to Westmoreland county, Virginia, to lay in the claim of the heirs to the estate of William Moore, deceased, | $150 00 | |
| r—26. 1813. | To ditto, on 2nd occasion, to move the family to Kentucky, | 150 00 | |
| a—27. | To goods purchased to clothe the family, | 90 37 | |
| a—28. | To money expended in moving the family, | 356 50 | |
| a—29. | To hire of Wagon and team, | 250 00 | |
| a—30. | To cash paid John Smith's account for boarding, | 212 00 | |
| a—31. 1814. | To cash paid Thomas Allen, clerk, $1 90, and another fee bill of later date, 58 cents, | 2 48 | |
| a—32. | To cash paid Thomas Urie, guardian, per receipt, | 15 00 | |
| a—33 | To cash paid A. Caruthers, as per receipt, | 20 00 | |
| | | $1246 35 | |

The summary of these accounts, and the sum <span>Chapline</span> with which the guardian charges himself, before <span>and</span> he applies the advances to the surviving children <span>Moore, &c.</span> separately, is thus:

LAWSON MOORE, TO THE HEIRS OF GEORGE
        MOORE,                                    DR.
To one half of the amount of the valuation of the real es-
tate,                                      $9526 26

        CR.
By half of the account, M,          2467 89
By account N, for expenses of
moving the family &c.               1246 35
By guardian's account B, against
Allen L. Moore,                      ' 64 42
                                    ———3778 67
Balance due the heirs of George Moore,
with interest from the 25th March, 1814,   5747 59

                                    $9526 26

After the aforegoing accounts against the wards, Items of the charges numbered, 1, 2, 3, 5, 6, 7, 19, 20, 21, 22, account al- 23, 24, 25, 26, 27, 28, 29, 30, 31, 32 and 33, as here lowed, and stated, were admitted by the court; number 4, 8, 9, ed by the cir- 10, 11, 12, 13, 14, 15, 16, 17, 18 and 25, as here cuit court. stated, were rejected. Having allowed those items in the account, against the estate, one half thereof is charged by decree against the children of George Moore, and having allowed all of the account N, except one item, the whole of that is charged to the children. Thus for expenses of looking after the estate of Lawson Moore, has been allowed by the decree, $1389 72, and for expenses of bringing the children to Kentucky, including three other small charges, the sum of $1096 35, making togeth- er the sum of $2650 49, which is deducted from the sum for which the guardian is to account to the wards separately, and thereafter the individual charg- es upon the wards are allowed.

Lawson Moore admits in his answer, of re- Money re- ceiving some advances from the agent of the ad- ceived by ministrator *de bonis non*, out of the personal es- Moore from tate, at one time amounting to one thousand dollars, trator *de bonis* and other sums, which he says, he does not recol- *non.* lect; but has not charged himself with any portion of the personal estate, but resists his liability to the wards for that, because, he says, he gave a re-

ceipt for that, not as guardian, but obliging himself to refund it in case of a deficiency of personal assets, and because he expended the whole of the sum of $1000, in removing the family to Kentucky. The deposition of Mr. Helpenstein, to whom this receipt was given by Moore, for the money, proves it to be for $1414 50; but whether this receipt includes the whole amount of the personal estate received from Helpenstein, cannot be distinctly understood from his two depositions; it may, or it may not include the whole amount received from Helpenstein, the agent of the administrator *de bonis non*. The court charged the guardian with $707, of this receipt. Thus it was, that the decree made the amount of real and personal estate, belonging to George Moore's heirs, $10,233 26, from which was deducted the before mentioned allowances of $2550 49; reducing the sum divided among the surviving children of George Moore, to $7682 79; this sum is made to carry interest from the time the recognizances for the real estate fell due, and against this the accounts for support and education are allowed.

Moore's objections to the decree.
After swallowing the whole personal estate charged upon the guardian by the decree, the allowances made to him in that decree have reduced the amount due on the recognizances for the real estate, by the sum of one thousand seven hundred and eighty dollars forty-nine cents, before the charges for support and education of the wards begin. But the guardian is not content with this, he has appealed, and insists upon his account as stated to the commissioner; he insists on the rejected items, and objects to being charged with any part of the personal estate.

Charges of Moore against his wards held to be outrageous, at first blush.
For the aggregate of his own expenses and services in the management of the estate the guardian of one half and owner of the half charges $3939 33; half of this he charges upon the wards; and upon his wards, for removing them from Westmoreland to Kentucky $756 50, together with the sum of $915 74, for the fee to Messrs. Duncans, making an aggregate charge upon the estate of his wards of $3641 40, not to mention peccadilloes. These charges are distinct from their support and education,

and not accompanied by one single correspondent increase of their estate. They are charges made by the guardian upon the wards, to reduce their moiety of the real estate due them by his own recognizances, entered into before the orphan's court as the purchaser. The expenses of his management thus demanded by his account, exceed one third of the estate of the infants.

The charges are notoriously outrageous, at first blush. But it is said, the guardian has been in pursuit of the personal estate, with a view to prevent a sacrifice of the real estate. How stands that matter? In all this pursuit; with such copious charges for services rendered and for expenses, not a dollar of the personal estate has been acknowledged by the guardian as chargeable to him for the benefit of his wards. The benefit is speculative merely. In 1813, the wards had guardians appointed for them by the orphans' court of Pennsylvania resident on the spot, men of character and integrity, bound with sureties for the performance of their duties. The administration of the personal estate in Pennsylvania had been committed in 1812, before Lawson Moore's arrival in Carlisle, to men resident there, of known repute and responsibility, and they too were bound in bond, with sufficient sureties, in the penalty of sixty thousand dollars, for their faithful administration. The fear of insecurity of the real or personal estate was imaginary. It is a fear which a court cannot, under the circumstances, regard.

The attempt to remove the administrators, Messrs. Irvine and Given, seems to have grown out of L. Moore's eagerness to get the control of the whole estate, real and personal. But it is said that by his exertions the lands have been sold at a high price. Be it so, he has not been the loser. He took them at the price of $19,052 52, and sold them for $20,-063; he sold two of the tracts for $15,712, on the fourth of March, 1814, before his recognizances fell due or began to carry interest, and the third he sold on the 29th November, 1816, for $4351, as is agreed by the parties. He has sustained no loss for which to ask remuneration; whereas the charges which he

*(margin:)* CHAPLINE AND MOORE, &c.

*(margin:)* Moore charges, for pursuing the personal estate in the hands of safe administrator and guardians in Pennsylvania, not allowed.

CHAPLINE
AND
MOORE, &c.

No one may assume an agency for an infant and thereby bring charges and loss on them.

asks against the infants, if allowed, would throw a loss upon them, to his great gain.

The allowances made by the court for services and expenses of 1812 and 1813, and charged upon the estate, amount to $1833 1-3, the one half of which has been deducted from the purparts of the infants. This allowance cannot be approved by this court. Lawson Moore of Kentucky, the owner of one half the estate, chose to go to Carlisle to look after his own interest; he had never seen the children of George Moore; he did not know their names; he assumed an agency for them, unsolicited even by those having the custody and care of the children, and charges them with wages and his expenses. For such services the law will imply no assumpsit, nor will equity. It is contrary to the principles upon which courts of equity act in the exercise of their jurisdiction as the guardians and protectors of infants and their estates, to permit any one to assume an agency for infants, and bring charge and loss upon them by that agency.

Charges of Moore against his wards, for his travelling expenses and services in Pennsylvania, unjust.

In 1812, September, Lawson Moore sued out process for partition of the lands. According to the laws of Pennsylvania the lands are valued and the inquisition was returned into court, and at September term, 1813, he takes the lands at the valuation, as permitted by the laws of that state: the infants are there represented by their proper guardians of their estate, duly appointed by the orphans' court: and now he charges the infants for this. He instituted the process, the law took care of the infants, and provided them with guardians, and yet this person, who was no guardian, brings a charge upon the infants for supposed benefits by him conferred, in the pursuit of his own interest. At the same term of the orphans' court, the administrators presented an account of the personal estate, and upon inspection, the court declared the assets were ample to pay all debts. From this time forward the defendant was the sole owner of the real estate, he was the debtor to the infants, by the recognizances, for the value of their respective portions of the real estate so transferred by law to him, and he was cognizant of the account of the administrators, and of the suf-

ficiency of personal assets to pay all debts. Up to this time he had acquired no claim upon the infants for his expenses and services in the management of the estate. He was neither administrator nor guardian then, the law had fully provided administrators and guardians to take care of the interest of the infants. From this time forward all his trips to Pennsylvania have not brought any increase of the funds of the infants in his hands which he is willing to account for. His charges for these trips are without colour of right.

The charges for removing the infants to Kentucky, are exorbitant, and without foundation for claim against the children for any part. Who asked Lawson Moore to remove the children from Virginia to Kentucky? What prompted him to remove them? His answer states he found them in poverty and obscurity: they were the children of his brother: "he will not attempt to describe his feelings on that occasion"—"he saw nothing of liberality or charity extended towards them"—to the mother "he gave it as his opinion that she could make out better to support herself and children in Kentucky than where she was"—"he informed her that he would do for them every thing in his power, and in case William Moore's estate should prove insolvent, he would support her out of his own estate; for at that time what would be saved from William Moore's estate was entirely uncertain; he most solemnly denies that he was actuated or influenced in those offers of friendship by any future pecuniary motive whatever." This is the account which he gives himself. The deposition of Barnett states, that Lawson Moore did promise Mrs. Hannah Moore that if she would move to Kentucky he would take her and her family out free of expense. A desire to better their situation, feelings for his relations, friendship, uninfluenced by any future pecuniary motive whatever, were his inducements to desire and advise the mother to remove herself and children from her father, and from "a most destitute and helpless condition," "where "he saw nothing of liberality or charity extended towards them." These generous, liberal, charitable, and disinterested feelings of friendship and con-

Vol. VII.                V

*Margin notes:*

Chapline and Moore, &c.

Account of Moore against his wards, for removing them and their mother from Virginia to Kentucky, before he was appointed their guardian, disallowed.

Argument against this charge for the removal of the widow and children.

sanguinity were praiseworthy. Actuated by them, he says he removed the mother and the children to Kentucky. In the gratification of those feelings he looked for his reward. It is clear that the children could make no assumpsit to pay for their removal, and the mother could not for the children, and did not even for herself. But the uncle claims his compensation and pecuniary reward, because of the supposed benefit resulting to the children by removing them from a condition of want and obscurity in Westmoreland to plenty and light in Kentucky. They were not removed from Virginia until after Lawson Moore had become their debtor by the recognizances, for upwards of nine thousand five hundred dollars. That sum might have removed want and obscurity from them in Virginia. The light of the inheritance, glimmering upon them, discovered them to an uncle, who before knew neither their ages, names, nor existence. Judge Parker of Westmoreland, had agreed to undertake the guardianship of the children, and was prevented by their removal to Kentucky. Under the guardianship of Judge Parker, and the protection of their grandfather, who in their utmost need, had still given with good will, according to his means, the children might probably have done well in Westmoreland, and escaped heavy charges, and a law suit with their guardian, in coming at their inheritance. The mother there might have been instrumental in propping the decline of her father, who had been paternal to her and her children in their poverty. The mother and the children, there, might have escaped the wound inflicted upon their feelings by the unjust and unmerited assault which has been made, in this cause, upon the conduct of her father, to help out the charges for removing the children to Kentucky. If, however, they have done better, and grown more luxuriously, by being transplanted to the soil of Kentucky, those feelings of the uncle which prompted him to advise and undertake the removal, uninfluenced "by any future pecuniary motive whatever," will have received their own gratification. Under the circumstances, this court can see no foundation for raising a charge against the children for the expenses of their removal. He was not their guar·

CHAPLINE AND MOORE, &c.

dian; he had no power to command or direct their movements; as their uncle, he gave the advice and persuasion; he promised the removal as the courtesy of friendship and consanguinity; he was then their debtor by recognizances; he had no right to prescribe his own terms of payment, nor will equity help him to convert his arrangement with the mother into a charge upon the children.

*Gaurdian may not charge his wards with clothing, furnished them before his appointment, as of good will and courtesy.*

The charge of ninety dollars some cents, for clothing to the mother and children furnished in Westmoreland cannot be allowed. At that time, Lawson Moore was not guardian; he was their debtor it is true; their estates were separate and distinct; those articles were incidental expenses of removal, bestowed upon the mother and children, without account as to how much to this and how much to that; with his own money and goods he had a right to be bountiful, but with the money of the infants, none. The time, the manner and the circumstances, bespeak it a bounty, a gratuity; his after appointment of guardian gives him no claim to charge these goods upon the infants and their estates in the aggregate. Persons are not to be encouraged to furnish infants with goods, as of good will and courtesy, and afterwards to charge them as for necessaries.

*Moore's charge against his wards, of one half the sum he paid counsel employed by himself, to represent him in the affairs of the estate, before he was appointed guardian, disallowed.*

The credit of $457 87 cents, for one half of the receipt of Messrs. Thos. and Jas. Duncan to Lawson Moore, dated 30th April, 1814, was also erroneously allowed. This receipt was given for nine hundred and fifteen dollars seventy-four cents, as paid by Lawson Moore, upon a contract by him with them, of the sixth of September, 1812, by which he retained them as counsel for himself and the heirs of George Moore, to support the interest of himself and co-heirs in the estate of Wm. Moore, deceased, in all cases where Messrs. Duncans had not been previously retained against the estate, they to have for their services five per cent upon the whole estate, real and personal, after payment of the debts and expenses. Upon this contract Messrs. Duncans passed their receipt, at the foot of an account of particulars, for the sum of $9 5 74 cents. But this sum was paid partly by the accounts standing against them in the books of William Moore, deceased, as

<div style="margin-left:2em">CHAPLINE
AND
MOORE, &c.</div>

appears by the face of the account, by the deposition of Mr. James Duncan and by the allowances to the administrators in the settlement of their accounts. The allowance made to Lawson Moore by the decree of one half of this receipt, has conver ed the amount of those book accounts, to the exclusive benefit of Lawson Moore, and moreover charges the one half thereof upon the shares of the children of George Moore. If it were proper to have allowed this contract of Lawson Moore with Messrs. Duncans, to charge the infants, yet those accounts should have been deducted from the amount of $915 74, receipted for by Messrs. Duncans, as payments made out of the joint funds of Lawson Moore and the infants, and half the residue only carried to the credit of Lawson Moore, on his account as guardian. But by allowing a credit for half of the whole amount of the receipt, the heirs of George Moore have lost their moiety of the book accounts, and lost the like sum out of their shares.

<div style="margin-left:2em">Argument a-
against
Moore's
claim for
contribution
in the pay-
ment of his
counsel.</div>

Messrs. Irvine and Given, from their appointment in 1812, to their resignation in September, 1813, accounted for the administration of $23,151 74 cents; to which is added the commission agreed upon. They had in their hands, ready to administer, seven thousand four hundred and twenty-six dollars fifty cents, in money, a sum more than sufficient to pay all the debts subsequently paid by the administrator *de bonis non.* The administrators retained for their services the sum of $1426 50 cents, according to the agreement of Lawson Moore, they passed over to the administrator *de bonis non* the rights and credits of the decedant, together with six thousand dollars in money. The administrator *de bonis non* charges himself with $17,480 89 cents; the balance reported by former settlement, after deducting the allowance of $1426 50, and for interest on judgments &c. $757 28, making in all $18,238 17, according to his settlement of 1822. Deducting the sum of six thousand dollars in money, and the debt (sued for and finally reported as lost, by verdict for defendant) of $7983 40, which was put in suit by the former administrators against Michael Ege, and there remained the farther sum of $4254 97 to be accounted for

by the administrator *de bonis non;* of this he reports
a long list of insolvents and debits against him which
were never collected, shewing that of the $17,480
89, turned over to him by the former administators,
he had collected only about two thousand dollars,
over and above the sum of $6000, in money, re-
ceived from the former administrators. Messrs. Ir-
vine and Given, had in fact paid and provided the
money to pay all the debts and more than enough,
as early as September, 1813, and the orphan's court
then declared of record the assets were amply suffi-
cient; they did not resign until they had provided
fully for all the creditors. Therefore, the real es-
tate was secure from the creditors before Lawson
Moore made his election to take it at valuation, and
entered into the recognizances to the infants for their
moiety. His after trips to Carlisle were not on ac-
count of the interest of George Moore in the real
estate; that was his own by election. As to his at-
tention to the personal estate, whatever it may have
been, it was voluntary; it has been attended by no
beneficial effect to the heirs of George Moore. Of
the administrator *de bonis non* he received fourteen
hundred dollars and upwards; the administrator *de
bonis non* has suffered him to discount with Messrs.
Duncans their book accounts against the contract of
Lawson Moore of 1812, and the administrator *de
donis non* has paid to Messrs Duncans their per cent-
age, on the amount of the personal estate remaining
after debts and expenses, which remained unadjust-
ed by the receipt of April, 1814; he has paid the
additional two and a half per cent to the former ad-
ministrators; the account of his administration was
not presented to the orphan's court until the 12th
December, 1822, and the balance therein reported
for distribution, the guardian by his answer does not
admit he has received. In all this, there is no bene-
fit resulting to the infants by any operations of Law-
son Moore, so far as this court can see. In the set-
tlement of the administrators, Irvine and Given,
Lawson Moore agreed to give them for their servi-
ces and for resignation, five per cent on the moneys
collected by them, and two and a half per cent on
the monies to be collected by their successor; these

CHAPLINE
AND
MOORE, &c.

sums are allowed in the settlements, $1426 50 in the first, $47 25 in the last; the administrator *de bonis non* has been allowed for his services $300, and there is allowed to Mr. Caruthers for his services as attorney and counsellor at law, the sum of $245, and to other gentlemen of the profession, sums amounting to $90, have been allowed in the two settlements with the orphans' court. To attorneys and counsellors, the sum of $335: to the administrators *upwards of seventeen hundred dollars*; making together $2,108 75 cents, already paid out of the personal assets by the administrators. If this receipt and contract of 1812 of Messrs. Duncans and Lawson Moore be added, then the whole would be $3096 20 cents, (the receipt of $915 74, and the commission on the balance of personal estate $71 71,) making the allowance for attorneys and counsellors fees $1322 45.

It is the duty
of executors
and guardi-
ans to em-
ploy able
counsel, and
they will be
allowed in
their ac-
counts the
customary
charges for
such services.
It is the duty of executors, administrators or guardians, in suits necessarily to be prosecuted or defended, to draw to their aid the services of men learned in the profession of the law, and for so doing they should be allowed, in settling their accounts, such sums as are usually paid for like professional services by men ordinarily prudent in their own affairs, provided they have actually employed gentlemen of skill and ability and have actually paid for their services. In the settlement with the orphan's court such fees have been allowed. But when such fees have already been allowed, and deducted out of the estate, to the credit of the administrators, the allowance of the additional sum claimed by Lawson Moore, by reason of the contract of the 6th Sept. 1812, and receipt founded on it, would be extravagant. It cannot be traced to any equitable principle. When Lawson Moore made that contract he was not the guardian of those infant children; that contract was not necessary nor beneficial to the infants, so far as this court can see from the circumstances appearing in the record. The real estate was not in litigation; the administrators, Messrs. Irvine and Given, were men of integrity, fair character, responsibility, and were men well skilled in business; they had given ample security for the faithful discharge of their duties. The administrators, the better to discharge

their duties, and knowing that some demands were already disputed, retained as their counsel in all cases, Mr. Caruthers, a gentleman of integrity and having the reputation as standing among the foremost in his profession; for his services, as well as for the occasional services of others, allowances have been made in the accounts as settled by the administrators before the orphan's court. The acts of the administrators in employing counsel in the legal affairs and management of the estate were the acts of the fiduciary legally constituted to take care of estate. The employment of Messrs. Duncans by Lawson Moore was an act of his own; he was not a fiduciary; he was neither an administrator nor a guardian; he had no trust to act for the infants.

*Chapline and Moore, &c.*

It is true that Messrs. Duncans were gentlemen of integrity, and standing among the first in the profession of the law, but the act of Lawson Moore in employing them grew out of a desire to get the control of the estate; he desired to get possession of the stock of merchandise to bring to Kentucky, this the administrators would not permit; he conceived a jealousy and suspicion, (unwarrantable as it appears to this court,) of the administrators. Either Mr. Lawson Moore's eagerness to come into quick possession of the estate, or his suspicion of the administrators, (although men of the first respectability and established good character,) or his distrust of the powers and capacities of the constituted authorities of Pennsylvania to enforce a faithful administration, or the damages in case of default in the administrators, produced the contract of 1812, with Messrs. Duncans. This court cannot give in to any such distrusts or apprehensions. The interests of the infants was placed upon a sure and stable foundation by the act of the law, in appointing administrators capable and trust worthy, and binding them also by very sufficient sureties. Mr. Lawson Moore attempted to remove the administrators; his application to the court failed. It was to the interest of the infants to have their inheritance under the management of agents appointed by law and bound for a faithful account; they were incapable of managing it for themselves; it was the interest of Mr. Lawson Moore

*Guardian not allowed to charge his wards with fees of counsel unnecessarily employed to represent him as their co-distributees, before his appointment to the guardianship.*

CHAPLINE
AND
MOORE, &c.

to manage his inheritance for himself; he was capable; the infants could not act, and must be passive to the ordinances of the law for their safety; here the interests of Mr. Lawson Moore and the interests of the infants separated. The Pennsylvania administrators and Pennsylvania guardians were safe agents for the infants; Mr. Lawson Moore was eager to be his own agent as to his interest in the estate.

Moore's claim for part of his counsel fees, disallowed.

The dissimilarity of interests and capacities in conducting the affairs, caused Lawson Moore to sue the writs of partition, and upon their return to become the sole owner of the lands, and bound to the Pennsylvania guardians, in the recognizances—thus he obtained the control of the real estate. By contract he induced Messrs. Irvine and Given to resign, and Mr. Leonard came in, as administrator *de bonis non;* this was in September, *1813;* the children were yet in Westmoreland; in the winter of that year he brought them to Kentucky and after become their guardian. As guardian and debtor to them by recognizances, their interests were not very similar; but as guardian for the infants who inherited one moiety, and as heir of the other moiety, on his return to Carlisle, in 1814, he controlled the whole estate; he retains personal estate under a refunding receipt; he discounts with the Messrs. Duncans their book accounts, his contracts with them and with the former administrators, are carried into effect by the administrator *de bonis non;* his accounts remain open until December, 1822, and the accounts of Lawson Moore as guardian are yet in litigation. In all this we are unable to perceive the benefit which has resulted to the infants by any agency of Lawson Moore in the management of the estate, upon which the contract of 1812, and the receipt grounded on it, can or ought to be for any part decreed against the infants.

Charges of the guardian for an account in the name of the grandfather

The next item of the guardians account, is that referred to in the commissioners report, account N. No. 8 and exhibit D. It is an account stated by the grandfather, Smith, against the orphans of George Moore, deceased, for boarding, at fifty dollars each, in 1813, and schooling Elizabeth and Allen Lawson,

six dollars, amounting to two hundred and twelve dollars, dated 15th November, 1813, with an order to the guardian of the orphans to pay it to Mrs. Hannah Moore, dated same day, with a receipt subscribed with her name, as having received it of Lawson Moore, guardian, on the 12th day of March, 1814; to this the wards excepted, because they owed Mr. Smith nothing, and because the account is not proved. This account is dated about the time of the departure of Mrs. Moore and her children from Westmoreland. There is no proof of the justice of such account, nor of payment of it; the answer, the circumstances and the depositions repel the justice of the demand.

The charges for copies obtained in 1812, amounting to $22 83, were excepted to by the wards, as not supported by any proof, and if obtained were for the defendant, Lawson's, own benefit; the copies are not produced as called for, and there is no evidence to sustain the charge. In 1812, Lawson Moore was not the guardian. These are disallowed by this court.

The fee bills of Thos. Allen, are for services rendered Lawson Moore himself, but describing him as guardian, the one for entering his attorney, in this suit against him as guardian, and for a copy of the order appointing commissioners to settle his accounts. The other is for a copy of his appointment as guardian, with the county seal &c. These are disallowed by this court.

The charge for county seal to affidavits, is not a proper charge against the infants. These are affidavits taken in Jefferson county, Virginia, to prove Lawson Moore the heir—the children of George Moore, or that he left any children, are not stated in any one of the affidavits.

The charge for Wm. Ramsey's receipt, as clerk of the orphans' court, is disallowed; the services were rendered for Lawson Moore himself and not for the benefit of the heirs; the charge is for entering satisfaction, acknowledged by himself as guardian, upon his recognizances to the children for the price of the

CHAPLINE AND MOORE, &c.

against the wards for boarding &c. rejected.

Item for copies of papers not allowed.

Fee bills against the guardian, not allowed against the ward.

Expenses of affidavits, rejected.

Fee of the clerk of the Orphan's court for services rendered the guardian, not al-

CHAPLINE
AND
MOORE, &c.

lowed against
the ward.

land, and filing the evidence of his guardianship—for this purpose, no doubt, the copy of his appointment, with county seal, was obtained, according to Mr. Allen's fee bill on the 5th of March, 1814, and filed in the orphan's court of Pennsylvania on the 29th April, 1814.

The receipt of the 26th October, 1813, for one dollar twenty-five cents, is disallowed by this court; there is nothing in the cause, nor on the face of the receipt, to shew what the tax was for, or that the heirs of George Moore were bound for any part of it.

The sum of $15, paid to Thos Urie, the Pennsylvania guardian, as by his receipt, is allowed; so also, the receipt of Andrew Caruthers for $20.

Guardians
shall not be
allowed ac-
counts a-
gainst his
ward to effect
the capital of
the infant—
the income
may be anti-
cipated, and
in extraor-
dinary cases
part of the
capital ap-
priated by an
order from
the chancel-
lor, not oth-
erwise.

These accounts, M and N, were the great subjects of litigation between the parties, the decision upon them is preliminary in its nature, for if Lawson had been entitled to the credits claimed upon these accounts, it would have materially changed the credits to be allowed for maintenance of the infants. A court of equity never sanctions the conduct of a guardian to break in upon the capital of the infant's estate, by his own authority; the court may be applied to under extraordinary circumstances, and has rarely permitted by its own order a reduction of the capital; the circumstances must be cogent and extraordinary to induce the court to assent to break in upon the capital; the income may be anticipated under suitable circumstances, but for the mere purpose of maintenance of a child in health and infancy, a court of equity will not permit a sinking of the capital. Cases of hardship may occur where the estate of the ward is not sufficient for maintenance and education out of the yearly profits or interest, but it is better that an individual should suffer such a hardship, than to break through a general rule, to the endangering the interests of all infants. The claims of the defendant upon these accounts of general charges are against established rules for the safe keeping of the estates of infants and the control of their guardians.

Before he was guardian, he says, he rendered services, which were beneficial by converting the land into money at a high price; that was done under the authority of the laws of Pennsylvania, and in pursuance of his writ of partition; by that he became a bound in the recognizances for the value of their part, otherwise he could not have converted their lands into money, not even if he had been their guardian; upon a mere speculative opinion of what the value of the estate might otherwise have been, this court cannot act for the purpose of releasing a part of those recognizances; but for that proceeding, the infants would have had precisely what they inherited; he has chosen to take it at its appraised value, and upon the terms prescribed by law; there that matter ends. His claims after that time are very extraordinary; before he brought the children to Kentucky, he owed them $2381 56-1 2 cents each, with current interest after the 25th March, then ensuing, amounting together to $9526 26 cents. Being so indebted, he brings the children from their native place to another State, for this he asks this court to allow him, one hundred and fifty dollars. for the arrangement, two hundred and fifty dollars for the use of a wagon, and three hundred and fifty-six dollars and fifty cents, for expenses for thirty-nine days, making in all, seven hundred and fifty-six dollars, and this he asks by way of reducing the capital; neither the father nor the mother, nor the guardian, would be allowed for such a charge, neither can one standing in the attitude of the defendant. But for what did he bring them to Kentucky? To become their guardian. Having become so, he enters an exoneratur upon his recognizances, and when he is brought to account, as-s a court of equity to permit him by his guardianship, to reduce the capital, by the sum of $3778 67, for services and his own expenses, independent of the maintenance of his wards, and having so reduced it, his accounts for maintainance each year overrun the annual interest; this is not permissible. The only reason offered by the defendant in this case is, he has been hunting after the estate, but has not charged himself with any thing as the beneficial result to the infants, for such extravagant waste of their estates.

Moore's claims against his wards for services before his appointment to their guardianship, held to be unjust.

CHAPLINE
AND
MOORE, &c.

Facts of the
case between
Moore and
the widow,
mother of his
wards, and
his claim for
their main-
tenance.

In settling the questions between Mrs. Hannah Moore, now Mrs. Chapline, and the defendant Lawson, her claims upon her children, and her claims upon the defendant Lawson, are inseperably connected. Lawson Moore, the guardian, placed Mrs. Hannah Moore in a house of his in the country, with the use of the curtilage, a small garden, and a small lot of ground, the whole tenement between four and five acres; he furnished her with such articles as were necessary for house keeping, and with supplies of provisions &c. for the subsistance of herself and children, from about the 1st January, 1814, until her marriage with Abraham Chapline, in 1819. Lawson Moore admits in his answer, that she was destitute of support in Virginia, except by her labor and the assistance of her father: that he induced her to come to Kentucky with her children, by promises of friendship, and that if William Moore's estate proved insolvent, he would support her out of his own: that he told her he would provide her a place, and a negro boy to assist her, but afterwards when the prospect of the estate became brighter, that it was understood that her boarding of the children would enable her to pay the rent and the hire of the boy, and this before she left Virginia; but he denies that he promised her the house and boy free of charge. That Mrs. Moore was left destitute by the death of her husband, and that she lived in a house provided for her by her father, and supported her children in Virginia, by her own industry is clear from the proof, as also, that she was reluctant to part with her friends, but was induced to come to Kentucky by the promised friendship of Lawson Moore; but the proof goes only to state that herself and children were to be brought to Kentucky clear of expense; friendship and assistance in Kentucky was promised; but the proof does not go so far as that Lawson Moore was to provide her a home free of rent. The proof is clear, that in Kentucky her children lived with her, that she was industrious, frugal, spun and wove, and provided them with clothing manufactured at home. That she was promised by Lawson Moore, the guardian, compensation for the maintenance of the children out of their estate, and

that he furnished the supplies with a view, on his part at least, to compensation from the estate of his wards.

CHAPLINE
AND
MOORE, &c.

As to the mother's right to compensation out of the interest yearly accruing to the children, there is no difficulty, for her needy circumstances are clearly made out, as well as her industry and prudence for the support of her children.  Although parents are under a natural obligation to support their children, and therefore, in the general, no allowance will be made, to father or mother in capable circumstances, out of the separate estate of a child; yet to the mother, and even to the father in distressed circumstances, a suitable allowance will be made for the support of the child.  When that suitable allowance is ascertained, Lawson Moore is entitled to have it applied in account between himself and Mrs. Moore, and when that account is settled, then he is entitled to credit with his wards for so much, as he has paid on their account in satisfaction of their dues to the mother.

Parents under a natural obligation to maintain their children, will not be allowed for their support out of the children's estate, except where the distressed circumstances of the parents require it.

Standing in this attitude, Lawson Moore furnished the mother with various articles, of the product of his farm, and merchandize &c. from time to time, for four years, without agreement as to price.  Very shortly before the marriage of Mrs. Moore with Abraham Chapline, and with a full knowledge of the intended marriage, Lawson Moore, stated an account of great length against Mrs. Moore, amounting to nineteen hundred and twenty-five dollars; he stated an account for her against himself, as guardian of the children, for boarding, washing, mending and making cloths, viz: against Elizabeth for four years, at $54 per year, $216 for boarding; washing, mending and making cloths, two years at six dollars, $12, $228; against Judith, for five years boarding, at same rate, $270; washing, mending and making cloths, at six dollars per year, and finding some clothes, six dollars, $36, $306; against William, boarding four years and one month, at same rate, two hundred and twenty dollars fifty cents; washing, mending and making for five years, at six dollars per year, and finding him clothing five

Moore's account against his ward and their mother, and his settlement with her

years, at five dollars per year, $55, $275; total a-
gainst the three, $809; there is added, "to sundry
clothing furnished for children for six years, omit-
ted heretofore, 250 dollars:" to making sundry
clothing &c. 50 dollars; to boarding up to this 25th
March, 1819, 40 dollars; total $1139. To each
child's account, is then added one hundred and
thirteen dollars more, in figures without explana-
tion, supposed however, to be one *third* of the
three additional items, added after the first sum-
ming up, so that Eliza's account is 341; Judith's
419 dollars, and William's 389 dollars; upon this
account against himself, is endorsed, L. Moore's ac-
count against *Mrs. Moore, up to* this time, 1708
dollars, amount of Mrs. Moore's account "for board-
ing, clothing &c. up to this time, $1139; balance due
L. Moore, $574;" for this sum of eleven hundred and
thirty-nine dollars, he took Mrs. Moore's receipt to
himself as guardian, and her separate note to him-
self for 574 dollars, expressing that it was upon a
settlement of that date, and for the balance of his
account for things furnished "since I came to Ken-
tucky." Lawson Moore charges each of the chil-
dren with the amount so stated against them respec-
tively in this account, and exhibited Mrs. Moore's
receipt on it as his voucher. Mrs. Moore, now Mrs.
Chapline, exhibited the account so made against her,
and prayed for relief against this settlement and
note.

Settlement
made by
Moore with
the mother of
his wards on
the eve of her
second mar-
riage, and the
notes taken
thereon, set
aside for its
iniquity and
his imposition
on her confi-
dence.

This settlement cannot stand. It was founded in
mistake and ignorance of her rights on the part of
Mrs. Moore, and an imposition on her weakness and
confidence in Lawson Moore; it was in fraud of the
contemplated marriage, and of the rights of the
children. Mrs. Moore could not write, and was in-
capable of settling *without assistance such accounts;*
no person but herself and Lawson Moore was
present at this transaction, although others were in
the adjoining room, and were called in to witness
the receipt and note, her daughter signing her mo-
ther's name.

In this account, she is charged with a horse, sad-
dle and bridle, furnished her brother John on her

father's order, and his expenses to this country, at one hundred and seventy-five dollars; this is the order spoken of for 212 dollars, of the 15th November, 1813, and Mrs. Moore, in her needy condition, is charged with her brother's expenses, and with a horse, saddle and bridle, which she never got, and upon an order which cannot be allowed against the children; she is charged with her brother's funeral expenses, to the amount of twenty-eight dollars, and with Doctor Hunn's account against her brother, thirty-five dollars, the whole charge on account of her brother, amounting to two hundred and thirty-eight dollars.

*Chapline and Moore, &c.*

*count against the brother of his wards' mother, not allowed.*

Upon the death of Allen Lawson Moore, under age, unmarried and intestate, his share of the estate of William Moore, passed to the mother, brothers and sisters, according to the laws of Kentucky. Allen, the infant son, was domiciliated and died in Kentucky; the estate was personal, and passes according to the law of the country wherein he was domiciliated, and died, (Embry vs. Miller, 1 March. 300.) Allen died in the year 1814, and from that time his mother became entitled to her fourth part of his estate; this was not brought into account.

*Personal estate of the deceased, wherever situated, passes according to the laws of the country, where the owner was domiciliated at his death. Here such estate of one dying unmarried and intestate and without father, passes to the mother and brothers and sisters.*

Again: the note, account and receipt taken by Lawson Moore, purport to be for things furnished since she came to Kentucky; instead of 1925 dollars, Lawson Moore's account is stated at 1708 dollars, and the credit allowed her, stated at $1139, instead of $1350, as in the account furnished to her; thus the order on the account, against the children whilst in Virginia, and the horse furnished in Virginia to her brother on that order, are kept out of view, and that order of Mr. Smith left to be exhibited against the children as paid by the guardian. By this account the children after being charged from January 1st, 1814, with boarding and clothing up to the 25th March, 1819, are then charged with an additional sum of three hundred dollars, for six years clothing omitted, and making sundry clothing, et ceteras, running back by this charge for six years, to March 1813, before the children came to Kentucky. The credit of 212 dollars, for 1813, and the sum of 300 dollars, in the receipt as taken from Mrs. Moore, would charge the children with 512 dollars improperly.

*Error in Moore's settlement with his wards' mother.*

CHAPLINE
AND
MOORE, &c.

Charges a-
gainst the
wards, dis-
allowed, be-
cause made
partly for
their main-
tenance be-
fore their es-
tate fell to
them, and be-
cause the pro-
per expendi-
ture would
be thereby
exceeded.

The sum of 212 dollars, cannot be allowed, for the rea-
sons before mentioned; the charge of 300 dollars,
this court is of opinion should not be allowed, be-
cause part of it is for the year 1813, before the chil-
dren had any income, before the mother had any
claims for allowance, and if allowed, the sums to
the mother, and the sums charged by the guardian,
independent of the mother's allowance, when added,
would exceed a proper expenditure annually upon
the children, and the allowance first stated at the
rate of sixty dollars per year for boarding and
clothing by the mother, is a liberal allowance out of
the estates of the wards, when compared with the kind
of clothing which the mother could furnish, and
with the supplies furnished by the guardian.

This requires that the account stated by Lawson
Moore, for Mrs. Moore, against each of the chil-
dren, should be abated by one hundred dollars; the
residue of the charge of $113, seems to have been
added for boarding from January, to 25th of March.
The mother's account, against Elizabeth, will be
reduced to two hundred and forty-one dollars fif-
ty cents; against Judith, to three hundred nineteen
dollars fifty cents; against William, to two hun-
dred eighty-nine dollars. These deductions require
correspondent reforms in the guardian's accounts
against the children.

Amount the
guardian had
received of
the adminis
trator being
left uncertain
above a cer-
tain sum, or-
dered that his
account for
that sum and
the claim of
the war is a-
gainst him, or
the adminis-
trator stand,
unprejudiced
for the bal-
ance.

Although the guardian has not by his answer, ex-
hibited an account of the personal estate which he
did receive, and denies he is, as a guardian, accounta-
ble for it, yet he admits he did receive a part of the
personal estate on a receipt to refund it, in case of
deficiency. By the deposition of Helpenstein, and
by the answer together, it is plain he did receive
$1414 50, but whether that sum includes all he re-
ceived, cannot be told. By the final settlement of
the account of the administrator *de bonis non*, it
does appear, that there is in his hands for distribu-
tion, the sum of $1434 24. This account, howe-
ver, was not settled with the orphan's court of
Pennsylvania, until the 12th December, 1822, after
answer filed in this cause. It does not appear that
the guardian has received that balance, so far as it

exceeds the receipt given in 1814 to Helpenstein; it is clear however, that the account so reported by the administrator *de bonis non*, has carried to the credit of the administrator, the sums which Lawson Moore paid to Thomas and James Duncan, on his contract with them, by means of the accounts which they owed William Moore, deceased, discounted as proved by Duncan's deposition, and by the receipt for $915 74, of which those accounts compose a part; the administrator *de bonis non*, has also received a credit for the additional two and an half per cent to Messrs. Irvine and Given, by virtue of Lawson Moore's contract with them; also a farther sum paid Duncans upon Lawson Moore's contract, and charged by the administrator *de bonis non*, against the estate. All these sums so paid on Lawson Moore's contracts, diminished the balance in the hands of the administrator, and are proper charges against Lawson Moore, in settling his account with his wards. But the difficulty is to ascertain whether these sums are, or are not, included in the receipt of $1414 50, spoken of by the answer, and in Helpenstein's deposition. Therefore, it seems proper to charge the guardian, Lawson Moore with one half of $1414 50, the amount so receipted for by him, and to make a decree without prejudice to the claim of the heirs of Geo. Moore, to any farther sum which they have a right to have, either from the guardian, Lawson Moore, or against the administrator *de bonis non*, or against the Pennsylvania guardians, who are beyond the jurisdiction of the court of chancery in Kentucky. Thus the sum of seven hundred and seven dollars twenty-five cents will be chargeable against Lawson Moore, as guardian of George Moore's children, on account of the personal estate so received by him.

Of all the charges by the guardian made against the estate of William Moore, deceased, and against the heirs of George Moore, as stated in his answer, and as stated in the accounts of the commissioner, M and N, (independent of the separate accounts against his wards,) this court allows but two items, the receipt of Urie for fifteen dollars, and that of Caruthers for twenty dollars, these to be defrayed

CHAPLINE
AND
MOO.E, &c.

equally by the four children of George Moore then alive.

Guardian's
account a-
gainst Allen
L. Moore, ad-
justed.

In the account of the guardian against the ward, Allen L. Moore, the whole of Doctor Hunn's account is charged to Allen, whereas, upon the face of the account, only thirty-one shillings are for medical services to Allen, the residue for services to William B. Moore. Making this correction, the account against said Allen, is reduced, for support, education, funeral expenses, &c. to sixty dollars forty-two cents, to which is to be added his share of Urie's and Caruther's account above mentioned, making eight dollars 75 cents, in the aggregate, sixty-nine dollars seventeen cents, charged upon Allen L. Moore's share of the real and personal estate.

On the death
of one of sev-
eral distribu-
tees the oth-
ers cannot
claim his
share of his
guardian or
the adminis-
trator direct
ly, but there
must be an
administrator
to receive
and distri-
bute it.

Upon the death of Allen L. Moore, an infant unmarried and intestate, his share was of right to be distributed among his mother, sisters and brother, in equal proportions. So that upon the death of Allen, the shares of Elizabeth, Judith and William, each received an accession of $595 39 cents, on account of the recognizance to him, for his part of the real estate, together with the interest thereon, running from the 25th March, 1814, at the rate of six per cent per annum, and also, an accession of his share of the personal estate, deducting therefrom the charges against him, of sixty-nine dollars seventeen cents; the balance to be distributed, is $107 70, which divided between the mother, brother and sisters, gives to each $26 92, and the mother is likewise entitled to her share, of 595 dollars 39 cents, on account of the recognizance aforesaid for the real estate, with like running interest as above. These shares of Allen Moore, deceased, however, in the hands of his guardian, although to be distributed to his mother, brother and sisters, ought to have been sought by them of the administrator, who is the proper representative of the personal estate; to that end the administrator of said Allen, appointed, or to be appointed, must be made a party.

Interest to be
accounted for

As to the shares of the personal estate charged upon the guardian, they ought to carry interest from the time that Lawson Moore received the per-

sonal estate, which appears by the deposition of Herpenstein, was receipted for as early as 1814.

Against the shares of the said wards, the guardian will be entitled to his accounts against them respectively for schooling and clothing, and maintenance when properly adjusted; to that end the accounts should be referred to a commissioner to state and report.

The receipt of Mrs. Moore to Lawson Moore, and her note to him for the balance, so as aforesaid stated, upon the settlement in the bill complained of, must be cancelled, and annulled, and the accounts between them, should be referred to a commissioner with power to take testimony and state the accounts accordingly, with direction to report the testimony, and his decision and statement of the accounts for the inspection and revisal of the court so as to enable the court to make a final decree.

The debt claimed by L. Moore, now the widow Chapline, not having been collected of her husband Abraham Chapline in his lifetime, has now again become the debt of Mrs. Chapline the widow, so that the executor, or administrator of Abraham Chapline, is not a necessary party.

From the testimony, it seems that Lawson Moore having in his hands, after the death of Allen L. Moore, the fund belonging to Mrs. Moore, the mother, has kept her ignorant of her right, charging extravagant prices for articles furnished, so as to swell an account against her and the children. Having a large sum in his hands due the wards, he has charged them with articles at credit prices; suffered the wards themselves to have accounts in the store; his accounts are stated very loosely; his account for boarding, drawn up for Mrs. Moore, the mother, and receipted by her to him, and charged by him to the wards, includes, probably portions of time for which he has again charged boarding in other accounts; in the account of Elizabeth, he has charged her with Miss Bradburn's account, and the same charge is repeated in the account of E. Moore & Co. Although required by statute, to account annually

CHAPLINE
AND
MOORE, &c.

to the county court, whose duty it is to put the sur-
plus of each year's income, above the support and
maintenance of the ward, to interest, (1 Digest, 643,)
the guardian failed *to render any account-from 1814,
until* summoned in 1820, and then his accounts are
very loosely stated; his claims for salary, for twelve
months in this year, and twelve months in the next,
include periods when he was at home; he charges
for the same trip twice, with other examples of care-
lessness and inattention; besides his exorbitant claims
for services and expenses, from 1813 to 1820, are ap-
plied by relation to the 25th of March, 1814, so as
to reduce the capital and stop the interest. His ac-
counts against his wards, are stated with a careless-
ness that runs to waste, and an extravagance that
tends to devour, insomuch as to call for animadver-
sion and strictest scrutiny of a court of chancery,
whose especial duty requires of them to take care of
infants and of their estates.

Commissions
refused the
unfaithful
guardian,and
the exemp-
tion from the
compound-
ing of the in-
terest on him,
allowed for
his only com-
pensation.

As to the claim which has been urged in argu-
ment for commissions, for the care and trouble of
the guardianship, the only allowance which this
court can make, is to forbear to charge interest up-
on the balance of each year's income, in the hands of
the guardian, exceeding the annual disbursements for
the wards, so as to charge him with only the simple
interest running on the capital in his hands.

Decree and
mandate.

It is, therefore ordered, and decreed, that each
and every of the decrees made in the cases afore-
said, be reversed and annulled, that the cases be re-
manded to the circuit court, with leave to the com-
plainants, Mrs. Chapline, Jacob Chapline and wife,
and Robert M'Afee and wife, to amend their bill so
as to make the administrator of Allen L. Moore,
deceased, (who has been, or may be appointed) a
party, and for such farther proceedings, orders and
decrees to be had, made and pronounced as may
consist with the principles and directions expressed
in the aforegoing opinion, and with the principles
and usages of equity.

Lawson Moore to pay the costs of each appeal.

*The counsel for Lawson Moore moved the court for a re-hearing, on the following Petition for a Re-hearing by* JAS. HAGGIN, ESQ.

CHAPLINE
AND
MOORE, &c.

Petition for a re-hearing.

IT is true that the sum in controversy in this cause, is sufficient to threaten the pecuniary ruin of Lawson Moore, but to a man who has passed the meredian of his life, and whose moral integrity has never yet been questioned, the effects of the opinion pronounced, in a pecuniary sense is no longer the chief consideration. This being a suit for an account, the counsel for the defendant had apprehended nothing involving character would be earnestly pressed. They had, they will acknowledge, discovered some indications of bitterness in the record, but this they supposed foreign from the questions to be decided, and had neither expected to vindicate their client from unjust aspersions, nor to minister to his possible gratification by animadversions upon his adversaries. And indeed, when remarks of counsel derogatory to the motives of the defendant, would have been answered and his conduct reconciled, the counsel was deemed out of order, and accordingly silenced. It was, therefore, certainly with surprise and regret that they witnessed the severity of remark with which the opinion abounds. His case is of peculiar hardship. Whatever is said of others, witnesses, attornies, administrators, guardians, of the many personages brought into review, (and they are numerous,) all receive the encomiums of this honorable court, except Lawson Moore. He is lacerated with an ingenuity and severity rarely displayed. We are obliged in justice to the man to say that we trust he will yet be found not to have merited so much asperity. Nay, we do find an exception, in the high estimation put by the court upon some of the witnesses. The opinions and advice of eminent lawyers, under whose counsel Moore deported himself in Pennsylvania, affords no mitigating circumstances worth a name; and the receipt of the grandfather Smith, for the board of the wards before Moore became their guardian, notwithstanding the high virtues the grandfather appears to have displayed, avails nothing when it would exonerate Moore of the payment of $212 a second time.

But we would not multiply remarks, perfectly recollecting, that we have already trespassed in the argument of this cause.

It is supposed that the journies of Lawson Moore to Carlisle, and his stay there, and his disbursements and compromise with the first administrators, and the efforts expediting the sale of the land, were all useless—the effect of groundless jealousy, inordinate solicitude to get possession of the effects, and productive of no beneficial result. On the contrary, we would have taken it for granted, in the absence of all proof, that a man of ordinary prudence, advised of the death of a connexion, who had been largely engaged in trade, would visit the state of his residence and there ascertain the condition of his affairs. Such must have been the reflections of Lawson Moore, whose circumstances in life and whose habits were averse to a distant and expensive journey; still he went, surely not from any exceptionable motive. When he arrived at Carlisle he found Given, who was no creditor or friend, the active administrator. And although his son, who lived with William Moore, as his nephew, recognized Lawson as his father, and although Lawson Moore had with him letters of James Morrison, William Morton and Alexander Parker of Lexington, well known at Carlisle, still Mr. Given took pains privately to disparage him, by insinuating that he was a drunken impostor, and to discourage him as to his prospects from the estate of his brother, by discrediting the books, and by the exhibition of an entry in pencil marks and an unknown hand, representing William Moore to have been a partner with a Bankrupt of the name of West—refused him free access to the books, or the liberty of taking copies or extracts. This administrator entered into an amicable arbitration with a youth of the name of Frazier, who had been raised in the store, and without the knowledge of Lawson Moore, permitted a recovery for upwards of $700, when in truth Frazier, by his own deposition taken in this suit, was only entitled to about $200. They entered into a similar arrangement with a dissipated youth of the name of Homes, and went into trial, and permitted an award for up-

wards of $300, without affording to Moore or his counsel an opportunity to defend, although Duncan; who is admitted to be eminent in the profession, hearing of the demand, had expressly made known his ability to defeat it, and the latter judgment was arrested by a positive and unwelcome interference on the part of Moore and his attorney. The attorney of the administrators refused to commune with Moore in relation to the affairs of the estate, and for this but one cause can be assigned, to-wit, the collision between the heirs and the administrator. They advertised a sale of the goods under the most propitious circumstances, the season, the demand of distant merchants, then in attendance, and the probability of a peace, all required an instant sale, but consumed several days with remnants, and then postponed the sale for several weeks, notwithstanding the remonstrance of the heirs, and ultimately Mr. Given, the active administrator, and this same Frazier became large purchasers. These combined with many other circumstances, created and confirmed suspicions on the part of Moore and his counsel, who are admitted to have deserved his confidence. highly injurious to the integrity of Mr. Given. And thus admonished by facts, and under the advice of his counsel, Moore deemed it due to himself and co-heirs to obtain the earliest possible control of the estate. True he had an additional motive for expedition—land in that country, as in this, had acquired an estimate surpassing all experience, and Moore and his friends deemed it very important that he should avail himself of that crisis, and the land could not be sold until it was ascertained, that the personal estate was equal to the demands of creditors. Therefore, Moore with the advice and concurrence of the lawful guardian, the legitimate representative of the heirs, agreed to give the administrators five per cent upon the monies, and two per cent upon the notes taken &c. Not for the purpose of bringing off the goods as supposed, for they had been sold, but to obtain the co-operation of one in whom they could confide, and to bring the land into market. And although the requisition of the per centage may seem exceptionable, yet in truth all the ad-

CHAPLINE
AND
MOORE, &c.
———————
Petition for a
re-hearing.

ministration services did not, as we apprehend, cost more than usual in Pennsylvania and in Kentucky.

Is it true that nothing was gained by this measure. On the contrary, we would not doubt that this administration, taking the usual course, and without the attendance and importunity of Lawson Moore, the sale of the land would have been deferred until its fall and then it would not have brought more than one half the sum, most probably not exceeding one third. This however is said to be speculative. We answer, that it is proved satisfactory; none conversant with the times can doubt, and the witnesses all, on both sides, affirm it. Moore, we acknowledge, did speculate rather badly. The guardians, although justified in so doing, would not venture to take the land at appraisement. Citizens would not then venture so much: but Moore, to close the concerns of the estate, and return to his family and domestic pursuits, incurred the hazard, and had the good fortune to indemnify himself.

We repeat that the land, but for the interference of Lawson Moore, would not have equalled the heirs to the amount of $9000. Under his superintendence it amounted to near nineteen thousand. This advantage then was gained. More than one half the amount of the sales are imputable to the services of Lawson Moore. Should not the co-heirs then contribute to his indemnity, in the proportion which they are enriched by him. No, it is said, because he found his individual profit in it. To test the principle, suppose the share of Lawson Moore had been but one fifth, and relying upon the justice of the co-heirs with whom he could not consult, because of their absence from the country or their infancy, he had taken precisely the steps now proved; his disbursements then would have surpassed his interest, and surely the principle which would forbid contribution in the present, would apply equally in the case supposed. The amount involved can afford no criterion: but infants cannot promise, nor will the law create a promise under the circumstances, says the court—therefore, it cannot be allowed in equity. We would solicit further reflection upon this rule of

equity. For we have understood that the want of re-
dress at law, where justice required it, but the law
would not imply an assumpsit, afforded a motive for
the interposition of the chancellor.    Thus joint se-
curities, at one time, could only obtain contribution
in chancery, because it was supposed the law impli-
ed no promise from the delinquent security, to him
who paid the money.    In the case of Shrieve and
Grimes, it was decided that the law would imply
no assumpsit on the part of Shrieve, the landlord
or proprietor, for improvements made by Grimes,
without a contract, and that Grimes could only re-
cover in chancery, therefore he sued in chancery,
and obtained his redress.    Indeed we believe the cas-
es are numerous where chancery has relieved be-
cause the law did not create a promise commensu-
rate with the demands of justice; and we would sub-
mit it to this court, if there can be a difference, in
equity, between the liability of adults and of infants
in such cases.    The redress is not the effect of con-
tract, express or implied—it is the dictate of right
and of justice.    An infant may make no contract for
the sale of his land; but he sells, and the purchaser
improves.    The contract is void, but the infant must
pay for improvements.    In no case of improvements
made upon the land of an infant, has it been held
that he was exempt from the rule, that one may not
profit by the loss of another.    Suppose five tenants
of land, one an adult, the others infants; the adult
discovers that the act of limitations is running and
will cut off the redress; he, therefore, sues in the
name of all the tenants; pays fees as for as a valua-
ble estate; gains the possession, and upon bill subse-
quently filed for rents and profits, shall claim contri-
bution for fees advanced to counsel &c. &c.    We
would believe it impossible that the chancellor
would reply, that although the estate has been sav-
ed by the exertions of this joint tenant, that still as
he was in part interested, he must bear all the bur-
then of the litigation.    If it be the rule, we would
believe it is not the understanding and the usage of
our country upon such subjects.    On the contrary,
we hope that it will be found that between all hold-
ing real or personal interests, as joint tenants, tenants

Chapline
AND
Moore, &c.

Petition for a
re-hearing.

in common and co-partners, infants or adults, contribution is due from the absent or inert, for all reasonable disbursements, in the improvement, preservation or recovery of the estate or right.

There can be no hardship in it, for the contribution is predicated upon a greater profit to the copartner.

If we are correct in the principle applicable to the subject, doubtless much is due to Moore for services and disbursements; and we deem it at present unnecessary to enquire how much; this would alone be proper upon an argument.

If Moore might be expected to distrust the administrators and their counsel, he surely was justifiable in engaging the Duncans, and should, therefore, pay them something, and how much that shall be, may likewise with greater propriety be discussed upon hearing.

Touching the charge for the removal of the family, we will only say that the Pennsylvania guardian made the advance for that purpose, and approved the measure. It was not entirely officious on the part of Moore, and we yet think, if Moore is to be compensated, the preponderance of proof is with him in amount. Indeed we would suppose that this charge for expenses &c. incurred with the privity and funds of the lawful guardian, would have been sanctioned by this court, but for the testimony of the witness, Barnett. Moore was certainly influenced by affection for his brother's children, in leaving his home and domestic duties and attending them to Kentucky. We do not think he would have undertaken it for strangers; yet we do not apprehend, that, therefore, it would have been said by this court, that he must again account for the money he received from the Pennsylvania guardian, who has all the powers of a rational father of the child, and expended in pursuance of the expectations and design of that guardian, had not a Mr. Barnett deposed that it was to cost nothing. That witness, however, was incorrect, for in his second deposition he distinctly denies it. This deposition in so

great a record has escaped the vigilance of this court; but we repeat, that it may be found in page 19, and the circumstances and proof are, therefore, on this subject in favor of the claim.

CHAPLINE
AND
MOORE, &c.
_____
Petition for a re-hearing.

Say, however, that the Pennsylvania guardian abused his trust; that he improperly handed this money to Moore, and authorized its application to purposes beyond the pale of his authority, and that although Moore did so apply it, he and not the guardian is answerable to the heirs a second time, still the widow would seem to us to be chargeable, and that an implied assumpsit would lie against her for all that she received, not that we would cancel gifts and bounties, but because no present was made.

As to the charge of the same item a second time, we cannot discover it, and our client says the opinion is predicated upon a mistake.

A re-hearing is respectfully requested.

The Court overruled the motion for a re-hearing—The CHIEF JUSTICE said—

THE bar is the nursery from which the bench is supplied. The bench has an influence in the proper cultivation and training of the bar. They have mutual action and re-action. To imprint the administration of the laws upon the public confidence, and to maintain it through successive generations, an elevation of *character* in the *bench*, and a *pride* of *character* in the bar, are important in the highest degree. This elevation and pride of character, the judge and the counsellor should mutually respect and cultivate. Not the one, nor the other should wantonly assail. These truths should ever be remembered. Their application to the petition will not be misunderstood, the commentary need not be expressed.

Decorum between the bench and bar.

The rule of practice established and prevailing in this court, at the time of the argument of these cases, applicable to the argument of cross appeals and writs of error, required, that the counsel for the plaintiff below should open the argument upon the errors on his part assigned; that the counsel for the defendant below should, next in order, be heard in answer to that assignment, and should open the ar-

Rules of practice in this court, in the argument of cross appeals.

gument of the errors assigned on his part; that the counsel for the plaintiff below, should next be heard in maintaining his assignment, and in answer to the errors assigned by the defendant; lastly, that the counsel of the defendant be heard in maintaining his own assignment of errors. Under this rule the counsel for the defendant, Moore, was in the attitude of concluding the argument, and when bound by the rule to confine his reply to the maintaining of the assignment of errors on his part, he was, in the opinion of the court, travelling out of his own assignment into the assignments of his adversaries; for this cause he was stopped by the court, and required to conform to the rule. The rule of practice, and the requisition upon the counsel to confine his argument within its limits, were explained at the time. He was stopped only for the purpose of explaining the rule, and requiring his compliance with it.

The counsel in his petition, by stating his opinion and inference from the facts, instead of stating the whole of the facts, has given a coloring, which distorts the act of the court. That rule was complicated and difficult of execution, and therefore, the court have, by a written rule, declared that cross appeals and writs of error shall be heard as one cause; the counsel for the plaintiff below to open the argument; the counsel for the defendant to be heard next in order, and the counsel for the plaintiff to conclude.

If there be an asperity in the opinion formerly delivered, it is the asperity of truth and fair inference from the facts disclosed by the record.

First opinion adhered to.    This court finds no cause for opening their decree, nor for changing their former opinion.

The petition is overruled.

*Crittenden,* for *Chapline and Moore's heirs; Haggin, Mayes* and *Daviess,* for *Lawson Moore.*